OPINION
{¶ 1} Defendant-appellant/cross-appellee, John E. Harkey, appeals the decision of the Lake County Court of Common Pleas, Domestic Relations Division, terminating his marriage to plaintiff-appellee/cross-appellant, Jane W. Harkey, and dividing the marital estate. For the following reasons, we affirm the decision of the court below. *Page 2 
 {¶ 2} John and Jane Harkey were married on July 6, 1985, in Lyndhurst, Ohio. Three children were born of the marriage: Collin B. Harkey (dob October 12, 1986); Rachael A. Harkey (dob May 12, 1988); and Adam E. Harkey (dob August 18, 1990). During the course of the marriage, the parties resided at 8078 Forestdale Drive, in Kirtland, Ohio.
 {¶ 3} John, a graduate of Case Western Reserve University with a master's degree in electrical engineering and applied physics, was the sole wage-earner for the family. For the early years of the marriage, John was a salaried employee of Gould Ocean Systems. In 1990, John founded Harkey Engineering, Inc. and became self-employed. As Harkey Engineering's sole employee, John performed engineering contract work, such as circuit design, programming, and product analysis.
 {¶ 4} On April 18, 2000, Jane filed a complaint for divorce on the grounds of incompatibility.
 {¶ 5} Jane was designated temporary residential parent and legal custodian of the three children. On June 26, 2000, the court ordered John to pay $606.29 per month per child for child support and $1,600 per month in spousal support. On June 29, 2000, John filed a Motion to Modify Temporary Support Order and a Motion to Modify Temporary Allocation of Parental Rights and Responsibilities. A hearing on the motions was scheduled for July 26, 2000. Upon agreement of the parties, the hearing was continued until December 19, 2000. The December 19 hearing date was continued upon motion of John's counsel due to medical reasons. On March 22, 2001, the parties agreed that the hearing on the pending temporary custody motion would be continued until trial and that the hearing on the pending temporary support motion would be held *Page 3 
on April 16, 2001. On that date, the parties agreed to continue the hearing on the support motion until trial.
 {¶ 6} On July 31, 2001, the court granted John's motion for a psychological examination of the parties and their children to be performed by Dr. Donald Jay Weinstein.
 {¶ 7} On September 28, 2001, less than a week before the scheduled trial date, the parties filed a Joint Motion for Conciliation. On October 2, 2001, proceedings were stayed until November 28, 2001, by way of an Agreed Judgment Entry.
 {¶ 8} Reconciliation proved unsuccessful and the court scheduled trial on the merits to begin in July 2002.
 {¶ 9} On December 14, 2001, John filed a Motion for Shared Parenting and a Motion to Modify Visitation.
 {¶ 10} On February 21, 2002, the court granted Jane's motion for a psychological examination of the parties and their children to be performed by Dr. Karen Bardenstein.
 {¶ 11} On July 12, 2002, the parties filed a shared parenting plan. According to its terms, Jane was designated the residential parent for school purposes and the children would continue to attend the Kirtland School District, where both John and Jane resided. John's parenting time began on Thursday evenings and continued through Monday evenings. Each party would have three weeks of time with the children during the summer, available in weekly increments.
 {¶ 12} The July trial dates were rescheduled until November 2002. The November trial dates were continued until March 2003, upon motion of Jane's counsel due to medical reasons. *Page 4 
 {¶ 13} On March 3, 2003, John filed a Motion to Modify Shared Parenting Plan and the parties negotiated certain stipulations regarding the division of property.
 {¶ 14} On March 4, 2003, the trial on the merits of the divorce began. This date was also fixed as the termination date of the marriage. Trial was again continued upon motion of Jane's counsel until July 2003.
 {¶ 15} On July 29, 2003, the second scheduled day of trial, John's counsel filed a motion to withdraw. Trial was rescheduled for November 2003.
 {¶ 16} On August 29, 2003, John's new counsel filed a Notice of Appearance and Motion for Continuance of the November trial dates. On September 4, 2003, the court granted John's motion, although one day of trial was held on November 24, 2003.
 {¶ 17} On February 23, 2004, John filed a Motion to Modify Child Support and Spousal Support.
 {¶ 18} On March 10, 16, and 18, 2004, trial was held before a magistrate on all remaining issues of the divorce.
 {¶ 19} The evidence demonstrated that John's average income from 2000 to 2003 was approximately $122,500, based on work for a single client of Harkey Engineering. In February 2004, a month before the final trial dates, John became unemployed and began receiving unemployment compensation of $1,000 a month.
 {¶ 20} In 2001, Jane obtained a master's degree in social work from Case Western Reserve University. In May 2001, Jane began working as a medical benefits facilitator for Laurelwood Hospital, earning $33,600 a year.
 {¶ 21} On August 9, 2004, the magistrate filed his Magistrate's Decision with respect to the divorce. In two separate Magistrate's Orders, the magistrate addressed *Page 5 
John's Motion to Modify Child Support and Spousal Support filed on February 23, 2004, and Motion to Modify Temporary Support Order filed on June 29, 2000.
 {¶ 22} On September 8, 2004, the trial court imposed a temporary restraining order denying the parties access to certain investment accounts at issue in the proceedings.
 {¶ 23} John and Jane filed objections to the magistrate's decision and sought additional time to obtain and review trial transcripts. A hearing on the objections was scheduled for May 10, 2005.
 {¶ 24} On November 19, 2004, the court ordered the case to mediation, which was unsuccessful. On April 20, 2005, the court terminated mediation and returned the case to its docket.
 {¶ 25} On May 10, 2005, John advised the court that he was not prepared to argue his objections because he could not afford to have the transcript completed. On June 6, 2005, the court authorized John to expend marital funds to complete the transcript. The trial transcript was filed on August 31, 2005. On October 28, 2005, oral argument was heard on the objections.
 {¶ 26} On June 28, 2006, the trial court ruled on the parties' objections, making several modifications to the magistrate's decision with respect to the child custody, child and spousal support, the division of property, and attorney fees.
 {¶ 27} On November 29, 2006, the trial court entered a final Judgment Entry of Divorce.
 {¶ 28} John timely appeals and raises the following assignments of error: *Page 6 
 {¶ 29} "[1.] The trial court erred in holding that $191,589.00 of the Paine Weber Resource Management Account was marital property and only $74,845.00 of said account was Appellant's separate property.
 {¶ 30} "[2.] The trial court erred in holding that the Solomon Smith Barney Preferred Client Account in the amount of $16,146.00 is marital property and not Appellant's separate property.
 {¶ 31} "[3.] The trial court erred in granting Appellee one-half of the Solomon Smith Barney SEP IRA.
 {¶ 32} "[4.] The trial court erred in holding that the Paine Weber Investment Account Number NG2659428 in the name of Harkey Engineering, Inc. was a marital asset to be divided equally.
 {¶ 33} "[5.] The trial court erred in ruling that the Allianz Life Insurance Company Life Insurance Policies are marital property to be divided equally.
 {¶ 34} "[6.] The trial court erred in holding that Appellee was to receive an additional $50,000.00 of marital property from the Paine Weber Resource Management Account to equalize the $50,000.00 Appellant withdrew from said account.
 {¶ 35} "[7.] The trial court erred in not making any ruling on a $7,000.00 cash marital asset of the parties.
 {¶ 36} "[8.] The trial court erred in ordering that Appellant shall reimburse Appellee for medical, dental and counseling fees and for orthodonture [sic].
 {¶ 37} "[9.] The trial court erred in holding that the Appellee should be granted sole allocation of parental rights and responsibilities for the parties' minor child. *Page 7 
 {¶ 38} "[10.] The trial court erred in its order requiring Appellant to continue paying temporary spousal support until October 31, 2005 and not reducing the amount of temporary spousal support.
 {¶ 39} "[11.] The trial court erred in its order concerning Appellant's obligation for child support pendente lite.
 {¶ 40} "[12.] The trial court erred in ordering that Appellant should be responsible for the first $1,300.00 of Dr. Bardenstein's fees.
 {¶ 41} "[13.] The trial court erred in ordering Appellant to pay $10,000 towards Appellee's attorney fees."
 {¶ 42} Jane raises the following assignments of error on cross-appeal:
 {¶ 43} "[1.] The trial court erred and abused its discretion by failing to award spousal support to Appellee and/or to retain jurisdiction to award such support, and in rejecting the Magistrate's recommendation on these issues without explanation.
 {¶ 44} "[2.] The trial court erred and abused its discretion in failing to find that Appellant was voluntarily unemployed and/or to deviate from the calculated child support amount when issuing its child support order.
 {¶ 45} "[3.] The trial court erred and abused its discretion in failing to award Appellant interest, or some other appreciation factor, with respect to the property division award."
 {¶ 46} Two standards of review are entailed in the parties' assignments of error. "In divorce proceedings, * * * the court shall divide the marital and separate property equitably between the spouses." R.C. 3105.171(B). "A trial court has broad discretion in making divisions of property in domestic cases." Middendorf v. Middendorf, 82 Ohio *Page 8 
St.3d 397, 401, 1998-Ohio-403, citing Berish v. Berish (1982),69 Ohio St.2d 318, 319. "A trial court's decision will be upheld absent an abuse of discretion." Id., citing Holcomb v. Holcomb (1989),44 Ohio St.3d 128, 131.
 {¶ 47} The abuse of discretion standard is also the appropriate general standard to apply when reviewing a trial court's adoption of a magistrate's decision, D.A.N. Joint Venture III, LP v. Armstrong, 11th Dist. No. 2006-L-089, 2007-Ohio-898, at ¶ 24 (citations omitted).
 {¶ 48} "A trial court's characterization of property as either marital or separate that involves factual questions is reviewed under a manifest weight of the evidence standard." Moser v. Moser, 11th Dist. No. 2006-P-0047, 2007-Ohio-4109, at ¶ 20 (citation omitted). A trial court's factual findings are entitled to a presumption of correctness and will not be reversed as being against the manifest weight of the evidence if they are supported by competent, credible evidence. Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80, citing C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, at syllabus.
 {¶ 49} "Separate property" is defined as "all real and personal property and any interest in real or personal property that is found by the court to be * * * acquired by one spouse prior to the date of the marriage." R.C. 3105.171(A)(6)(a)(ii). "A party claiming separate property is burdened to prove the independent nature of the property by a preponderance of the evidence." Gosser v. Gosser, 11th Dist. No. 2006-T-0029, 2007-Ohio-3201, at ¶ 12; Peck v. Peck (1994),96 Ohio App.3d 731, 734.
 {¶ 50} "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except *Page 9 
when the separate property is not traceable." R.C. 3105.171(A)(6)(b). Thus, traceability becomes the focus of the trial court's inquiry when the "commingling of assets has muddied the identity of separate property." Gosser, 2007-Ohio-3201, at ¶ 14; Peck, 96 Ohio App.3d at 734.
 {¶ 51} John's first assignment of error concerns the lower court's distribution of cash assets within a PaineWebber Resource Management Account, comprised of both cash and investment assets. The magistrate found that this account was used as the basis for virtually all of John's investment and financial transactions during the course of the marriage. All proceeds from the sale of investments during the marriage and employment income were deposited into the cash portion of the account. Both personal and business expenses were paid out of the cash portion of the account.
 {¶ 52} The Resource Management Account existed prior to the parties' marriage. At trial, John submitted an exhibit detailing, on a quarterly basis, the assets contained in the PaineWebber Resource Management Account from June 30, 1985, to December 30, 2002.[1] As of June 30, 1985, within a week of their marriage, the PaineWebber Resource Management Account had a value of $108,691, consisting of $70,138 in investments and $38,553 in cash.[2] At trial, a joint exhibit of the parties showed the Resource Management Account had, as of January 31, 2003, a value of $266,434. The magistrate determined $151,634 to be John's separate property, including $38,553, the original amount of the cash portion of the account. *Page 10 
 {¶ 53} In his decision, the magistrate noted that on two occasions during the course of the marriage, the amount of cash in the account fell below $38,553. In the fourth quarter of 1986, the cash balance was $18,559, and in the third quarter of 1997 the cash balance was $30,534. The magistrate noted that the low cash balance in 1986 was the result of investment purchases (USX, IBM, and Schering Plough), which "were sold in the first quarter of 1987 for approximately $39,000 which was returned to the cash fund."
 {¶ 54} The trial court disagreed with the magistrate that John has successfully traced the $38,553 as his separate property. In light of the extensive testimony regarding the commingling of marital funds in the cash portion of the Resource Management Account, the trial court concluded that John was only entitled to $18,559 of the cash value of the account, representing the lowest cash balance during the course of the marriage, as his separate property. The trial court ordered the marital portion of the Resource Management Account and John's portion to be adjusted accordingly.
 {¶ 55} On appeal, John argues there was no factual basis for the trial court to overturn the magistrate's decision. We disagree. The logic of the magistrate's decision is that the profit from the sale of the investments purchased in the fourth quarter of 1986 and sold in the first quarter of 1987 continued to maintain its character as John's separate property. It is true that "money, being a fungible commodity, never loses its character." Okos v. Okos (2000), 137 Ohio App.3d 563,582 (citation omitted). Its traceability, however, becomes problematical after it is commingled with marital cash assets and, then, used to purchase other forms of assets. In the present case, the *Page 11 
investments John purchased, causing the amount of separate cash in the account to drop to $18,559.52, appreciated in value and were sold. The magistrate expressly found that the appreciation of these investments was marital. The proceeds were again deposited into the commingled cash account. By this process, the funds lost their character as separate property. In other words, the dollars used to purchase investment assets did not maintain their character as separate property after the investment assets were sold and the proceeds returned to a commingled pool of marital and non-marital funds.
 {¶ 56} Even if it were conceded that the funds expended and earned from sale of particular investments in 1986 restored John's entitlement to the original cash value of $38,554, the cash value of the Resource Management Account fell below that value again in 1997.
 {¶ 57} The situation with the cash value of the Resource Management Account may be compared with another situation in the divorce. During the course of the marriage, the parties purchased property on Blueberry Lane in Kirtland, Ohio, for $120,000. Here, it was possible to trace a portion of the purchase price to John's separate property, specifically to funds from an American Capital Pace investment account (also part of the Resource Management Account), which pre-existed the marriage and which had not been commingled with marital funds. The status of the Pace account as John's separate property and as the source of $63,286 toward the purchase price of the Blueberry Lane property was not disputed. Such precision is not possible to account for John's original cash assets once they have been used to purchase investment assets. *Page 12 
 {¶ 58} The difference between the magistrate and the trial court's determination regarding the amount of cash John successfully traced is not, as John maintains, based on a varied weighing of the evidence, but, rather, on the conclusions to be drawn from the essentially undisputed evidence. We find no abuse of discretion in the trial court's rejection of the magistrate's finding as to John's separate cash property.Guenther v. Guenther (Oct. 19, 1994), 9th Dist. No. 2827, 1994 Ohio App. LEXIS 4733, at *7 (trial court abused its discretion by awarding husband $20,000 contained in a savings account at the time of marriage where "the balance of the account had gone up and down during the marriage because of withdrawals from it and deposits to it").
 {¶ 59} John also contends, under the first assignment of error, that the trial court erred by rejecting the magistrate's determination that certain investment assets within the Resource Management Account were John's separate property. These assets were part of the Resource Management Account prior to the marriage and were sold in the course of the marriage. The sum of the sale price for these investment assets was $56,795.[3] The trial court concluded that John "could not successfully trace the[se] funds after sale and deposit of the proceeds into the [Resource Management] cash pool account."
 {¶ 60} As with the cash portion of the Resource Management Account, the issue is not whether these pre-existing investments constituted John's separate property, but *Page 13 
whether he was able to trace the funds after their sale. We agree with the trial court that John failed to meet his burden of tracing these funds after sale. Fisher v. Fisher, 2nd Dist. No. 30298, 2004-Ohio-7255, at ¶ 17 ("the trial court didn't reject [the husband's] claim that he had inherited monies[,] [r]ather, it held that he failed to show that monies he inherited were owned or invested by him in a form that made them traceable to the portion of the current accounts he claims").
 {¶ 61} It is not simply a matter of crediting John with $56,795 out of the marital estate. The money John claims must be traced, not merely credited. The weakness in John's argument is evident from the fact that the time of the termination of the marriage, the Resource Management Account only had $77,747 in cash assets, despite the fact that for several years marital funds in excess of $100,000 had been deposited into the cash account. If we were to reverse the trial court and adopt John/the magistrate's position, John would be entitled to $95,353 from a cash account with a value of only $77,747. To award John the whole of the cash account, when this account contained commingled marital funds, is unfair. To speculate as to how much of the proceeds from the sale of the original investments remained in the cash account, years after some of the proceeds were generated, is not the responsibility of the courts.
 {¶ 62} Apart from the cash account and the pre-existing investment accounts, the magistrate and the trial court agreed that an American Capital Venture account worth $56,286 was John's separate property and that the balance of the Resource Management Account was marital and to be divided evenly between the parties. John's final argument under this assignment of error is that the magistrate and trial court both erred in finding the balance of the Resource Management Account to be marital. *Page 14 
 {¶ 63} John relies on his oral testimony that any proceeds from his premarital assets were deposited in the cash account and then used to purchase new investment accounts without commingling with marital assets. Thus, John maintains that all investments acquired during the course of the marriage were acquired by the expenditure of non-marital funds.
 {¶ 64} The trial court discounted John's testimony that he mentally kept the income from pre-marital investments separate from other marital funds deposited in the cash account. In addition to the fact that John's business income was deposited into the cash account, the court noted that family expenses were paid out of the cash account and that Jane was able to write checks against money kept in the cash account. Finally, the court noted that John's spreadsheet did not acknowledge any taxes paid on the capital gains reflected therein. At trial, John acknowledged that he and Jane filed a joint return and that the taxes on investment proceeds would have been paid with marital funds. In light of the considerable evidence of commingling of marital and non-marital funds, the trial court was within its discretion to conclude that the balance of the Resource Management Account was marital property.Fisher, 2004-Ohio-7255, at ¶ 9 ("[o]ral testimony as evidence of the separate nature of the property, without documentary proof, may or may not be sufficient to carry the burden [of traceability]").
 {¶ 65} The first assignment of error is without merit.[4] *Page 15 
 {¶ 66} In his second assignment of error, John argues the trial court erred in its determination that the Solomon Smith Barney Preferred Client Account, valued at $16,146, was marital rather than his separate property. The Smith Barney Account is comprised of three investment accounts (General Electric, Intel, and UTS Uncommon Values) acquired in 1997, according to John, with premarital assets and/or transactions involving premarital assets.
 {¶ 67} John's arguments are essentially the same as those raised under the first assignment of error and are unpersuasive for the same reasons. The Smith Barney account was acquired twelve years after the parties married with monies from a fluctuating account containing marital and separate funds distinguished, if at all, in John's mind. Sedivy v.Sedivy, 11th Dist. Nos. 2006-G-2687 and 2006-G-2702, 2007-Ohio-2313, at ¶ 21 ("[property acquired during marriage is presumed to be marital unless it can be shown to be separate").
 {¶ 68} The second assignment of error is without merit.
 {¶ 69} In the third assignment of error, John argues the trial court erred in finding a Solomon Smith Barney SEP IRA account, valued at $202,651 as of December 31, 2002, to be marital property. John cites to his 2004 trial testimony in which he was asked whether it was true that he made an $11,000 contribution to the Smith Barney IRA in 2003. John responded "could be." Since the termination date of the marriage was March 4, 2003, the trial court was without authority to award Jane half of the $11,000 contribution. Moreover, John continues, the court's division of the Smith Barney IRA is particularly unfair in light of the fact that Jane was awarded, as her *Page 16 
separate property, a University Hospitals Health System 401(k) acquired during the marriage.
 {¶ 70} John's argument is unconvincing. The trial court awarded Jane half of the Smith Barney IRA's fair market value as of December 31, 2002, prior to John's alleged 2003 contribution. Moreover, John's response that he "could" (might) have made an $11,000 contribution in 2003 gives no indication if that contribution was made before or after March 4, 2003. If made prior to this date, the contribution is marital. Finally, Jane's UHHS 401(k) was valued at $1,763 as of March 31, 2003, and is of negligible value in comparison with the Smith Barney IRA. The propriety of the court's award of this asset has no bearing on the propriety of the court's division of the Smith Barney IRA.
 {¶ 71} The third assignment of error is without merit.
 {¶ 72} In the fourth assignment of error, John argues the trial court erred in finding a PaineWebber Investment Account in the name of Harkey Engineering, valued at $4,264 as of June 30, 2000, to be marital property. John cites to his trial testimony that this was a business account used to receive gross receipts until being transferred to the Resource Management Account. John claims it is unfair to divide this account since it had already ordered him to pay child and spousal support based on his income which passed through this account.
 {¶ 73} This argument is without merit. All the money earned by John through Harkey Engineering was marital and would have maintained its character until it was ultimately deposited into the Resource Management Account, the balance of which, as explained above, was also marital. Nor does it make sense that the income on which *Page 17 
support obligations are based cannot also be divided as a marital asset. The $4,264 in the Investment Account was only a small portion of John's total income on which his support obligation is based. John's support obligations were incurred subsequent to the acquisition of the funds in the Investment Account.
 {¶ 74} The fourth assignment of error is without merit.
 {¶ 75} In the fifth assignment of error, John argues the trial court erred in determining that two Allianz Life Insurance Company policies, with cash values of $13,324 as of December 5, 2002, and $2,802 as of December 31, 2002, are marital property. At trial, John testified that he purchased these policies prior to the marriage, in 1974, and continued to pay annual premiums of $500 on the policies throughout the course of the marriage. The trial court offered no explanation for its determination that these assets were wholly marital.
 {¶ 76} Jane argues John's separate interest in these assets cannot be determined because no evidence was submitted of the policies' value at the time of marriage. We disagree. In Hoyt v. Hoyt (1990),53 Ohio St.3d 177, the Ohio Supreme Court held that a trial court abused its discretion when it evenly divided the husband's pension, a portion of which was premarital, without explanation. Id. at 183. The court held the wife "was entitled only to a proportionate share of the marital asset, i.e., that which was earned during the course of the marriage." Id. Moreover, the court held the marital and premarital portions of the asset "should have been calculated by the ratio of the number of years of employed spouse's employment during the marriage to the total number of years of his or her employment." Id. The Hoyt formula for dividing a pension *Page 18 
asset, only a portion of which was marital, is equally applicable to the Allianz insurance policies at issue herein and, in fact, John urged to the court to apply such formula.
 {¶ 77} The problem with dividing the Allianz policies as John urges is that the documentary evidence before the court does not support the testimony that the policies were issued in 1974. Rather, the policy statements for each policy indicates the policies were issued in December 1983, when John was age 31.
 {¶ 78} Accepting the issue date of 1983 for the policies, the premarital existence of these policies is less than two years and John's separate interest in the policies constitutes only 11.77% of their cash value. If the division of the Allianz policies is recalculated according to these figures, John would receive $9,014.51 (11.77% of their cash value plus one-half of the 88.23% of their remaining marital value) and Jane would receive $7,115.95 (one-half of the marital portion of the policies' cash value). The difference between these figures and the trial court's division of the policies, with each party receiving $8,065.22, is less than $1,000. Given the uncertainty in the testimony regarding these policies and the relatively minor difference in the result, any error on the part of the court in failing to determine the marital portion of the policies is harmless and does not rise to the level of an abuse of discretion.
 {¶ 79} The fifth assignment of error is without merit.
 {¶ 80} In the sixth assignment of error, John claims the trial court erred by determining that the sum of $50,000 removed from the PaineWebber Resource Management Account and given to his brother for "safe keeping" was marital. The basis of John's argument is the same one he raised under the first assignment of error, *Page 19 
since all of the Resource Management Account is his separate property, the $50,000 withdrawn from that account also constitutes his separate property.
 {¶ 81} As discussed above, the Resource Management Account is not John's separate property. The sixth assignment of error is without merit.
 {¶ 82} In the seventh assignment of error, John challenges the trial court's decision regarding approximately $7,000 or $8,000 in cash located in the marital residence at the time Jane vacated the residence. Jane admitted taking about half of this money, or about $4,120, when she vacated the marital residence. John testified that she took all of the money. The magistrate found the evidence inconclusive and ordered "the parties to retain any of the cash they received without receipt of any other property as a set-off or equalization." John argues he is entitled to an offset of $3,500 based on the credibility of his testimony, or that he is entitled to an offset of $620 if Jane's testimony is accepted. John also claims the trial court erred by not specifically ruling on his objection to this part of the magistrate's decision.
 {¶ 83} Given the uncertainity of exactly how much cash was in the marital residence and how much Jane took, we find no abuse of discretion in the magistrate and trial court's conclusion that the parties retain whatever portion of that money is in their possession.
 {¶ 84} As to John's other argument, the Ohio Civil Rules provide "[i]f one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections." Civ.R. 53(D)(4)(d). As a general rule, it is recognized "that it is better practice for a trial court to individually itemize and address objections separately." Alessio v.Alessio, 10th Dist. No. 05AP-988, 2006-Ohio-2447, at ¶ 36 (citation omitted). *Page 20 
However, the trial court's failure to do so here does not constitute a reversible error. In ruling on the parties' objections the trial court noted: "Due to the number of Husband's numerous objections and his presentation as to the same, the Court's decision herein is structured to address specific areas of Husband's objections. It must be stated Husband's objections are not numbered or set forth in an orderly format." Where the objections raised are not clearly itemized or clearly stated, the court does not err if it fails to expressly respond to every issue raised. Although the trial court did not comment on the magistrate's division of cash located in the marital residence at the time of separation, there is no suggestion that the trial court failed to perform the independent review of the magistrate's decision, required by Civil Rule 53(D)(4)(d).
 {¶ 85} The seventh assignment of error is without merit.
 {¶ 86} In the eighth assignment of error, John argues the trial court erred by ordering him to reimburse Jane the sum of $6,741 for the children's medical and dental bills.
 {¶ 87} The trial court's June 26, 2000 Judgment Entry, "allocating parental rights and responsibilities pendente lite," ordered John to pay all of the minor children's extraordinary medical and dental expenses. On August 9, 2004, the magistrate issued a decision on John's motion to modify the support orders, modifying the amount of child support John owed based on the changed employment situations of the parties. This decision affirmed the prior order allocating medical related expenses.
 {¶ 88} As the basis for this alleged error, John asserts Jane failed to inform the court and the Child Support Enforcement Agency that she became employed in May of 2001. If she had informed the court, John maintains, his obligation for the children's *Page 21 
medical expenses would have been adjusted by percentages reflecting the parties' relative incomes.
 {¶ 89} John's argument is belied by the fact that the magistrate heard testimony regarding both parties' employment situations, including Jane's employment, in its hearing on John's motion to modify the temporary support orders. After hearing this testimony, the magistrate affirmed the order that John be solely responsible for the children's extraordinary medical expenses.
 {¶ 90} When determining matters of child support, "[t]he court shall issue a separate order for extraordinary medical or dental expenses * * * and may consider the expenses in adjusting a child support order." R.C.3119.05(F). "The statute, by the use of the word `may,' gives the trial court discretion to consider the allocation of the expenses when adjusting a child support order. The award of extraordinary medical expenses is a matter left to the sound discretion of the trial court."Gerlach v. Gerlach, 10th Dist. Nos. 03AP-22 and 03AP-872,2004-Ohio-1607, at ¶ 20 (citation omitted); Hirschberger v.Hirschberger (April 27, 1990), 6th Dist. No. L-89-018, 1990 Ohio App. LEXIS 1619, at *19-*20.
 {¶ 91} We find no abuse of discretion in the magistrate's decision, or the trial court's judgment that John reimburse Jane for those expenses incurred pursuant to the order pendente lite. As Jane notes, the majority of the outstanding medical expenses were incurred in 2000, prior to her employment. After commencing full-time employment in July 2001, Jane's yearly income was $33,280. John's yearly income at this time was approximately $122,500. Hutchinson v. Hutchinson (May 29, 1998), 2nd Dist. No. 97-CA-40, 1998 Ohio App. LEXIS 2322, at *21 ("[g]iven that there is no *Page 22 
statutory requirement for the allocation of extraordinary medical expenses based upon the parents' income percentages, and that [the husband's] income is greater, we cannot say that the trial court erred by requiring [the husband] to pay these medical expenses").
 {¶ 92} The eighth assignment of error is without merit.
 {¶ 93} In the ninth assignment of error, John argues the trial court erred by overruling the magistrate's recommendation that a shared-parenting plan be adopted and by awarding Jane sole custody of the remaining minor child.[5]
 {¶ 94} The Revised Code provides that, "[i]f at least one parent files a pleading or motion in accordance with division (G) of this section [requesting shared parenting] and a plan for shared parenting pursuant to that division and if a plan for shared parenting is in the best interest of the children and is approved by the court * * *, the court may allocate the parental rights and responsibilities for the care of the children to both parents and issue a shared parenting order requiring the parents to share all or some of the aspects of the physical and legal care of the children in accordance with the approved plan for shared parenting." R.C. 3109.04(A)(2).
 {¶ 95} In determining whether a shared parenting plan is in the best interest of the children the court "shall consider all relevant factors." R.C. 3109.04(F)(1). The Revised Code provides an extensive, but non-exhaustive, list of factors for the court to consider when determining whether a shared parenting plan is in the best interest of the children. R.C. 3109.04(F)(1) and (2). Among these factors is "[t]he ability of the parents to cooperate and make decisions jointly, with respect to the children." R.C. 3109.04(F)(2)(a). *Page 23 
 {¶ 96} The magistrate determined a shared parenting plan would be in the best interest of the children. The magistrate based his decision on the fact that both psychologists recommended shared parenting and the parents had adopted a shared parenting plan in the course of the litigation. The magistrate also noted that the minor child would be comfortable with a shared parenting arrangement, both parents live in close proximity to each other, and there were no significant obstacles to the adoption of a shared parenting arrangement. The magistrate found that the shared parenting plan as submitted by John is not in the children's best interest, however. Accordingly, the magistrate held that, if John re-submitted his plan with certain changes as indicated in the magistrate's decision, the plan would be in the best interest of the children. Otherwise, Jane would be designated the residential parent and legal custodian.
 {¶ 97} John filed a Proposed Shared Parenting Plan incorporating the changes mandated by the magistrate, but objected to these changes as well as to the magistrate's finding Jane had not interfered with his parenting time. Jane filed an objection to the adoption of any shared parenting plan.
 {¶ 98} The trial court reversed the magistrate's decision. The court based its decision on the "non existent" ability of John and Jane to cooperate and make decisions jointly with respect to the children. In particular, John's "refusal to talk directly to [Jane] on any matters as to the children is a tremendous obstacle to shared parenting which this Court cannot ignore." Neither party disputes the finding that communication has been a problem between them, although they offer divergent explanations as to why this is so. Additionally, the trial court noted, as did the magistrate, that the sole remaining minor child has had difficulties in his relationship with John. *Page 24 
 {¶ 99} Bearing in mind that "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect," we find no abuse of discretion in the trial court's decision not to adopt a shared parenting plan for the few remaining months of the child's minority, particularly in light of the court's findings regarding the parents' ability to communicate and the child's relationship with John.Miller v. Miller (1988), 37 Ohio St.3d 71, 74; Kinney v. Kinney, 5th Dist. No. 2004CA00378, 2005-Ohio-5712, at ¶¶ 60-61 (shared parenting rejected where only one party favored it and the minor child was "hesitant"); Wingard v. Wingard, 2nd Dist. No. 2005-CA-09,2005-Ohio-7066, at ¶ 28 (the parties' inability to communicate or cooperate demonstrated shared parenting was not in the children's best interest).
 {¶ 100} The ninth assignment of error is without merit.
 {¶ 101} In the tenth assignment of error, John argues the trial court erred by requiring him to pay spousal support through October 2005 and by not reducing the monthly support obligation as recommended by the magistrate.
 {¶ 102} As noted above, John was ordered to make monthly spousal support payments of $1,600 beginning in June 2000. In the August 9, 2004 Magistrate's Order ruling on John's June 2000 Motion to Modify Temporary Support Order, the magistrate reduced the amount of temporary support owed to $1,000 per month, beginning May 2001, due to Jane's commencement of employment. In the August 9, 2004 Magistrate's Order regarding the divorce, the magistrate ordered John to pay spousal support in the amount of $400 per month, beginning in March 2004, for a period of three years, with the court retaining jurisdiction to modify the award. The magistrate based his decision on Jane's current income of $33,600 per year, John's current unemployment *Page 25 
compensation of $12,000 per year, and the relevant statutory factors. See R.C. 3105.18(C)(1). The magistrate emphasized that, in determining the amount of spousal support, courts should consider the earning ability of the parties, rather than their current employment situations. Given John's recent unemployment and the uniqueness of his employment history, the magistrate believed "the passage of time" would allow for a better determination of John's earning abilities. The magistrate considered any future employment by John a "potential change of circumstances which would allow modification of spousal support."
 {¶ 103} Under the magistrate's order, John would pay a total of $78,000 in spousal support, assuming no change in circumstances altering the $400 per month obligation.[6]
 {¶ 104} The trial court affirmed the initial support award of $1,600 per month from June 2000 to April 2001 and the reduced support award of $1,000 per month beginning in May 2001. The court noted that, as a result of John's failing to notify the court of his financial difficulty in securing a transcript prior to the schedule of May 10, 2005 hearing on objections, the temporary order of $1,000 per month had remained in effect for a prolonged period of time. The court, in the exercise of its "equitable powers," then ordered John's spousal support obligations to terminate completely in October 2005 without a reservation of jurisdiction.
 {¶ 105} Under the trial court's judgment, John's total spousal support obligation would be $61,600.[7] *Page 26 
 {¶ 106} John argues the trial court's factual finding that he failed to notify the court of his financial difficulty in securing a transcript is incorrect. John notes that his February 23, 2004 Motion to Modify Spousal Support advised the court that he currently was without any income. John also cites to his September 29, 2004 Supplemental Objections to This Court's Judgment Entry (Motion for Temporary Restraining Order), in which he expressly advised the court that he was without funds to obtain a transcript due to the court's restriction of his access to the PaineWebber Resource Management Account and the Solomon Smith Barney Business Account. Therefore, John asserts, the factual basis for the court's extension of his spousal support obligation to October 2004 is false and this obligation ought to have terminated in February 2004, when he filed the second Motion to Modify Spousal Support.
 {¶ 107} According to John's argument, his total spousal support obligation should be $52,600.[8]
 {¶ 108} We disagree with John's conclusion that, by terminating his spousal support obligation in October 2005, the trial court sought to penalize him for his delay in securing a transcript of the trial. Rather, the point of the trial court's observation was the result of the delay, rather than the cause of the delay: "As a result, the temporary order of spousal and child support has been in effect during the time the transcript was being prepared, filed, objections argued and the Court's consideration of same." As the above figures demonstrate, the trial court's modification of the magistrate's decision significantly reduced John's support obligation by over $15,000. Moreover, the *Page 27 
magistrate's order left open the possibility of the support obligation being increased if and when John became employed again. The trial court's decision foreclosed this possibility by not reserving jurisdiction to itself. The court's exercise of its "equitable powers" was in John's favor.
 {¶ 109} Thus, we do not accept John's position that, but for the delay in obtaining a transcript, the trial court would have terminated the spousal support obligation in March 2004. Such an intent is not evidenced by the court's judgment entry nor is it consistent with case law, cited by the magistrate, that "in determining alimony * * * each party must be deemed employed to the extent of his or her earning capacity in the absence of evidence that such employment cannot be obtained." Bevan v. Bevan, 11th Dist. No. 2005-L-018, 2006-Ohio-2775, at ¶ 29, citing Haninger v. Haninger (1982), 8 Ohio App.3d 286, 287;Johnston v. Johnston (June 14, 1996), 11th Dist No. 95-T-5212, 1996 Ohio App. LEXIS 2456, at *10 ("a trial court is to consider a party's earning ability and not actual income where the party is unemployed") (citation omitted).
 {¶ 110} The standard for awarding spousal support is not strictly based on merit or necessity, but, rather, what the court finds "appropriate and reasonable." DiNunzio v. DiNunzio, 11th Dist. No. 2005-L-124, 2006-Ohio-3888, at ¶ 54 (citation omitted). In determining the amount and extent of the support award, the magistrate considered several factors, including the parties' living expenses; the parties' educations; the fact that John earned three times as much as Jane when employed; that the parties were married for seventeen years and maintained an upper middle class standard of living; and John's extensive separate and marital property. John's argument on appeal does not challenge the reasonableness or the appropriateness of the spousal support award, *Page 28 
only the factual basis for allegedly extending the support obligation beyond his unemployment. In these circumstances, we find no abuse of discretion in the trial court's award.
 {¶ 111} The tenth assignment of error is without merit.
 {¶ 112} In the eleventh assignment of error, John argues the trial court erred by failing to credit him with the $524 which he paid monthly for health insurance for the minor children when calculating the temporary support orders.
 {¶ 113} "In any action in which a court child support order is issued or modified, in any other proceeding in which the court determines the amount of child support that will be ordered to be paid pursuant to a child support order, or when a child support enforcement agency determines the amount of child support that will be paid pursuant to an administrative child support order, the court or agency shall calculate the amount of the obligor's child support obligation in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of sections 3119.02 to 3119.24 of the Revised Code." R.C. 3119.02. The child support computation worksheet provides for an adjustment to a parent's "annual support obligation" for "[m]arginal, out-of-pocket costs, necessary to provide for health insurance for the children who are the subject of this order." R.C. 3119.022.
 {¶ 114} The terms of the child support computation worksheet "are mandatory in nature and must be followed literally and technically in all material respects." Marker v. Grimm (1992), 65 Ohio St.3d 139, at paragraph two of the syllabus. It is "error to exclude health insurance payments for children from the child support computation *Page 29 
worksheet." Wachter v. Wachter, 9th Dist. No. 23170, 2006-Ohio-6970, at ¶ 8 (citation omitted).
 {¶ 115} The child support computation worksheet, attached to the June 26, 2000 Judgment Entry ordering the payment of child support in the amount of $606.29 per month, does not credit John for any expenses incurred "to provide for health insurance" for the children.
 {¶ 116} At trial in March 2004, John testified variously regarding the amount he paid for the children's health insurance. At one point, he testified health insurance was $524 per month. At another point, John submitted an exhibit from Medical Mutual containing a schedule of insurance rates. According to this exhibit and John's concurrent testimony, insurance for the children would have been $117 per month.
 {¶ 117} The August 9, 2004 Magistrate's Order regarding John's June 29, 2000 Motion to Modify Temporary Support Order reduced the amount of support to $566.67, effective May 1, 2001, based on Jane's employment commencing in May 2001. The child support computation worksheet attached to the order does not credit John for expenses for costs necessary to provide health insurance for the children.
 {¶ 118} The August 9, 2004 Magistrate's Decision determined John's monthly child support obligation to be $425 per month, based on an express upward deviation from the child support guidelines. The magistrate also ordered Jane to provide for the children's health insurance.
 {¶ 119} In the judgment entry addressing the parties' objections to the Magistrate's Decision, the trial court noted John's argument that the temporary child support orders did not reflect his payments of $524 per month for health insurance. The court *Page 30 
observed "the purpose of a temporary order is to maintain the financial status quo between the parties" and that "such purpose is not the same as a final spousal [sic] support order issued after property distribution." Later in the judgment, the court overruled John's objections to the August 9, 2004 Magistrate's Order because he failed to comply with Civil Rule 53(D)(2)(b), which provides that a motion to set aside a magistrate's order "shall state the moving party's reasons with particularity and shall be filed not later than ten days after the magistrate's order is filed." Following the issuance of the magistrate's Decision and Orders on August 9, 2004, John filed objections, on August 23, to the Magistrate's Decision only. John never filed a motion to set aside the Magistrate's Orders. Although John supplemented his objections with arguments relative to the Magistrate's Orders, these were filed more than ten days following the Orders and were, thus, untimely.Spier v. Spier, 7th Dist. No. 05 MA 26, 2006-Ohio-1289, at ¶ 56 (a party that fails to set aside a magistrate's order as required by Civ.R. 53(D)(2)(b) "cannot raise any issue which could have been addressed in that order at the final divorce hearing") (citations omitted).
 {¶ 120} The trial court's judgment entry addressing the parties' objections is somewhat confused regarding John's arguments about the health insurance credit toward child support. The judgment entry appears to address the argument at one point, dismiss it at another, and later confuse it with objections raised to spousal support. In part, the court's confusion is a reflection of the confused nature of the John's objections, who raises the issue in his discussion of both the Magistrate's Decision and Orders. Further complicating matters, the initial order of support pendente lite was not modified by the Magistrate's Orders, but was affirmed in the trial court's final *Page 31 
Judgment Entry of Divorce. The modification of the support, effective May 1, 2001, was contained in one of the August 9, 2004 Magistrate's Orders. Accordingly, Jane's position that John has waived this argument would only apply to the modified order, which John failed to move to set aside, rather than the original order.
 {¶ 121} In light of these difficulties and given the peculiar circumstances of this case, we conclude that any error by the trial court in failing to credit John for the costs of health insurance was harmless error. Although John claims he paid $524 a month for the children's health insurance, the only documentary evidence in the record discloses costs of insuring the children to be $117 per month, or $1,404 per year. When the amount of pendente lite support is recalculated to include a $1,404 per year credit for the costs of health insurance, the difference is relatively minor. In the worksheet completed for the initial pendente lite support calculation, John's annual support obligation was $21,826 and he was the only employed spouse. Had John been credited for the costs of insurance, his monthly support obligation would have decreased $39 from $606 per month to $567 per month. In the worksheet completed for the modified pendente lite support calculation, effective May 2001, John's annual support obligation was $20,400.17, or 79% of the parties' combined support obligation. Had John been credited for the costs of insurance, his monthly support obligation would have decreased $31 from $566 per month to $535 per month.
 {¶ 122} The eleventh assignment of error is without merit.
 {¶ 123} In the twelfth assignment of error, John argues the trial court erred by ordering him to pay $1,300 of Dr. Bardenstein's fees.[9] These fees were charged by Dr. *Page 32 
Bardenstin, Jane's retained psychologist, for her appearance in court on July 21, 2003. The magistrate held John responsible for these fees on the grounds that Dr. Bardenstein's failure to testify was "the result of [John] considering and ultimately discharging his attorney" that day at trial. The trial court affirmed the magistrate's award, noting that the "transcript shows she appeared on July 21, 2003 to testify at trial" and John "chose not to question her and she was released from testifying." John argues that there is no evidence in the existing trial transcripts that he refused to question Dr. Bardenstein.
 {¶ 124} Regardless of whether John refused to question Dr. Bardenstein on July 21, 2003, the evidence demonstrates she appeared at trial to testify and was unable to do so, on account of John's decision to discharge his attorney that day. In his affidavit attached to a Motion for Interim Fees and Expenses, Jane's counsel stated Dr. Bardenstein was unable to testify at court "as a result of Mr. Harkey's conflict with his attorney." In the objections raised to the Magistrate's Decision, John claimed he was willing to proceed with her testimony but that his attorney refused to do so.
 {¶ 125} The twelfth assignment of error is without merit.
 {¶ 126} In the thirteenth assignment of error, John argues the trial court erred in ordering John to contribute $10,000 toward the payment of Jane's attorney fees.
 {¶ 127} The magistrate considered the issue of attorney fees under R.C. 3105.18(H), deleted as of April 27, 2005, which provided that "[i]n divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings * * *, if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to *Page 33 
award reasonable attorney fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees." The magistrate concluded that Jane would not be prevented from litigating her rights if attorney fees were not awarded and ordered each party to pay their own attorney fees.
 {¶ 128} By the time the trial court ruled on the parties' objections, R.C. 3105.18(H) had been replaced by R.C. 3105.73. The new statute provides: "In an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate." R.C. 3105.73(A).
 {¶ 129} It was the legislature's intent that R.C. 3105.73 apply retroactively to any "action or proceeding * * * pending in a trial or appellate court on the effective date of this act." Section 3(B), H.B. No. 36 (150 v —).
 {¶ 130} Under the new statute, the court is not required to determine a party's "ability to pay the attorney's fees that the court awards" and "whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees." Under the new statute, the standard is whether an award is "equitable" in light of the parties' income and marital assets, conduct, temporary orders, and any other factor the court deems relevant. *Page 34 Humphrey v. Humphrey, 11th Dist. No. 2006-A-0083, 2007-Ohio-6738, at ¶ 67; Berthelot v. Berthelot, 9th Dist. No. 22819, 2006-Ohio-1317, at ¶¶ 69-70.
 {¶ 131} The trial court modified the Magistrate's Decision by requiring John to pay $10,000 of Jane's attorney fees. The court noted the disparity in the parties' incomes in that John, while employed, earned three times what Jane earned at the time of trial. The trial court noted that John had paid "only a fraction of what the Court ordered as temporary child and spousal support." Finally, the court observed that John "delayed aspects of this case several times" while Jane "did not."
 {¶ 132} John's argument focuses on the trial court's determination that John's conduct delayed aspects of the trial while Jane's did not. John points out that Jane filed numerous motions for continuances and extensions of time on a variety of occasions, whereas he only sought a continuance after he had retained new counsel. John also notes, as explained above, that he put the court on notice that he was in need of funds in order to obtain a transcript of the trial before the magistrate.
 {¶ 133} John's arguments are only partially convincing. Although John may have put the court "on notice" that he needed funds to obtain a transcript, he did so within the context of objections to a temporary restraining order rather than by motioning the trial court to release funds for this purpose. The fact remains that John waited until the day of the hearing to advise the court he was unable to proceed with the objections. As discussed under the preceding assignment of error, John's discharge of prior trial counsel interrupted previously scheduled hearing dates, in addition to the motion for continuance filed by new counsel. In addition, the trial court noted John's numerous and disorganized objections to the Magistrate's Decision, including exhibits that had to *Page 35 
be stricken and preoccupation with "minor factual discrepancies" not rising to the level of an objection.
 {¶ 134} Even acknowledging that John's conduct was not solely responsible for the delay in the proceedings, the trial court's award was based on other factors, such as the disparity of the parties' income and marital assets. Although unemployed at the time of trial, John was earning considerably more than Jane up until a month before trial. The trial court also cited the fact that John failed to make child support payments and unilaterally choose to pay $1,100 per month of the $3,600 per month ordered by the court for child and spousal support.
 {¶ 135} In light of all of the reasons cited by the trial court, the decision to award Jane $10,000 in attorney fees is not inequitable or an abuse of the court's discretion. The thirteenth assignment of error is without merit.
 {¶ 136} In Jane's first cross-assignment of error, she argues the trial court erred by terminating spousal support without indicating any basis for doing so. In making an award regarding spousal support, "the trial court must indicate the basis for its award in sufficient detail to enable a reviewing court to determine that the award is fair, equitable and in accordance with the law." Kaechele v. Kaechele (1988),35 Ohio St.3d 93, at paragraph two of the syllabus.
 {¶ 137} In the present case, the trial court's reasoning for terminating spousal support was set forth above under the tenth assignment of error: the prolonged period of time in which John was required to pay support at the rate of $1,000 per month after his unemployment and motion to the court to reduce the support obligation. Cf. 3105.18(C)(1)(i) ("[t]he relative assets and liabilities of the parties, including but not *Page 36 
limited to any court-ordered payments by the parties"). Although the court does not provide an elaborate explanation of its reasons, its judgment provides enough "illumination of the facts and reasoning underlying the judgment" to satisfy its obligation. Bandish v.Bandish, 11th Dist. No. 2002-G-2489, 2004-Ohio-3544, at ¶ 18 (citation omitted). It should also be noted that, although the trial court reduced the magistrate's award of spousal support by over $15,000, the total amount awarded, $52,600, is still substantial.
 {¶ 138} The first cross-assignment of error is without merit.
 {¶ 139} Under the second cross-assignment of error, Jane argues the trial court erred by not finding John to be voluntarily unemployed for the purpose of calculating the child support obligation and by not approving the magistrate's upward deviation of John's monthly support obligation.
 {¶ 140} Neither the magistrate nor the trial court found John to be voluntarily unemployed. The magistrate, however, determined that John's monthly support obligation should be deviated upward to $425, based on "the final trial decision resulting] in the unemployed father having available resources of approximately $400,00.00." Cf. R.C. 3119.23(K) ("[t]he relative financial resources, other assets and resources, and needs of each parent" is a factor to consider in ordering a deviation from support guidelines).
 {¶ 141} The trial court calculated John's support obligations according to the guidelines contained in R.C. 3119.022 to be $112.30 per month per child while there are two minor children remaining and $155.09 per month per child while only one minor *Page 37 
child remains. The court overruled John's "objection to the deviation [as] moot in that Shared Parenting has been rejected by the Court."
 {¶ 142} It is unclear what relationship existed, if any, between the magistrate's upward deviation of John's support obligation and the shared parenting plan favored by the magistrate. Despite some uncertainty regarding the professed reason for abandoning the upward deviation, sound reasons exist for doing so. The magistrate's upward deviation was based solely on the fact of John's post-decree resources of $400,000. That conclusion, however, was undermined by certain actions of the trial court, such as reducing the amount of separate property belonging to John from the PaineWebber Resource Management Account from $151,634 to $74,845, and by ordering John to contribute $10,000 toward Jane's attorney fees. In light of these changes to the final division of property, the trial court was within its discretion to abandon the magistrate's upward deviation from the support guidelines.
 {¶ 143} Likewise, the trial court did not err by not determining John to be voluntarily unemployed and imputing income to him. It has been observed that a "parent's subjective motivations for beingvoluntarily unemployed or underemployed play no part in the determination whether potential income is to be imputed to that parent in calculating his or her support obligation." Rock v. Cabral (1993),67 Ohio St.3d 108, 111 (emphasis sic). Instead, courts will look for an "objectively reasonable basis" for deciding issues regarding a party's voluntary unemployment and imputation of income. Hardman v.Hardman, 166 Ohio App.3d 479, 2006-Ohio-1793, at ¶ 11 (citations omitted). *Page 38 
 {¶ 144} In the present case, the only evidence presented by Jane as an "objectively reasonable basis" for John's unemployment is the debatable fact that, in the month prior to trial, John did nothing to seek employment except make some phone calls. Such evidence does not compel a reversal of the trial court's decision on this issue.
 {¶ 145} The second cross-assignment of without merit.
 {¶ 146} Under the third and final cross-assignment of error, Jane argues the trial court erred by not awarding her interest or some other measure of appreciation on the property settlement given the length of time the case has been pending.
 {¶ 147} In Ohio, "[w]hen money becomes due and payable * * * upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code * * *." R.C.1343.03. "[A]n order distributing marital assets from one party to another has the
 {¶ 148} force of a money judgment, and the recipient is entitled to interest on any amount due and owing under the order but unpaid."Humphrey, 2007-Ohio-6738, at ¶ 45, citing Woloch v. Foster (1994),98 Ohio App.3d 806, 812.
 {¶ 149} Although Jane correctly observes the length of the current proceedings has been unusual, that fact, standing alone, does not compel the result that she is entitled to interest on the judgment. It has often been observed that a court's division of marital property and assets must be considered in its entirety. DiNunzio, 2006-Ohio-3888, at ¶ 80. In the present case, rather than address the length of the proceedings by awarding interest, the trial court has done so through an award of attorney fees. The *Page 39 
trial court may act within its discretion to determine which orders are equitable under the circumstances of a particular case.
 {¶ 150} The third cross-assignment of error is without merit.
 {¶ 151} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas, Domestic Relations Division, terminating the marriage of the parties and dividing the marital estate, is affirmed. Costs to be taxed against the parties equally.
CYNTHIA WESTCOTT RICE, J., COLLEEN MARY OTOOLE, J., concur.
[1] John testified that this spreadsheet did not reflect all the funds contained in the Resource Management Account during this period, but only "the initial assets" that he brought into the marriage. John described the spreadsheet as a "closed system," excluding those funds and expenditures relating to the marriage.
[2] The cash assets at the time of the marriage were held in a Merrill Lynch account worth $14,563, a Drexel account worth $23,614, and an Ameritrust account worth $376.
[3] A Charter Security investment had an original value, i.e. at the time of marriage, of $11,830 and sold during the second quarter of 1988 for $15,622. A Gould retirement investment had an original value of $6,985 and sold during the second quarter of 1986 for $8.087. A Caesar's investment had an original value of $13,076 and was sold during the third quarter of 1986 for $17,538. A JMB investment had an original value of $6,994 and was sold during the fourth quarter of 1998 for $10,000. A DeAnza account had an original value of $7,450 and was sold during the fourth quarter of 1997 for $7,195. A Sierra Real Estate account had an original value of $5,280 and was sold during the fourth quarter of 1994 for $1,359.50. The DeAnza and Sierra Real Estate accounts earned dividends during the course of the marriage which the magistrate concluded could not be traced.
[4] The magistrate's final disposition of the UBS PaineWebber Resource Management Account, valued at $266,434 was as follows: $114,800 was marital and $151,634 was John's separate property (consisting of the $38,553 original cash balance, $56,795 from the sale of pre-marital investments, and $56,286 for the American Capital Venture account). The trial court's disposition of the Resource Management Account was as follows: $191,589 was marital and $74,845 was John's separate property (consisting of $18,559 of the original cash balance and $56,286 for the American Capital Venture account).
[5] By the time the trial court granted the divorce, the only remaining minor child was Adam Harkey. Adam will become emancipated upon his eighteenth birthday on August 19, 2008.
[6] The calculation of $78,000 is as follows: $17,600 for the eleven months from June 2000 until April 2001 at $1,600 per month; $46,000 for the forty-six months from May 2001 until February 2004 at $1,000 per month; and $14,400 for thirty-six months beginning March 2004 at $400 per month.
[7] The calculation of $61,600 is as follows: $17,600 for the eleven months from June 2000 until April 2001 at $1,600 per month, and $54,000 for a fifty-four month period from May 2001 through October 2005 at $1,000 per month.
[8] The calculation of $52,600 is as follows: $17,600 for the eleven months from June 2000 until April 2001 at $1,600 per month, and $35,000 for a thirty month period from May 2001 through February 2004 at $1,000 per month.
[9] The magistrate ordered the balance of the fees charged by Drs. Weinstein and Bardenstein should be split evenly by the parties. The trial court adopted this decision. *Page 1